## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| JEAN M. STUSSIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:10CV1562MLM |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue ("Defendant") denying the applications of Jean M. Stussie ("Plaintiff") for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq.,  and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 405(g).  Plaintiff filed a Brief in Support of the Complaint. Doc. 16.  Defendant filed a Brief in Support of the Answer. Doc. 21.  Plaintiff filed a Reply. Doc. 22.  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c)(1). Doc. 15.

## I.
## PROCEDURAL HISTORY

Plaintiff filed her applications for benefits on June 11, 2008, alleging she had been disabled since August 1, 2007. Tr. 64-70.  Following an unfavorable determination, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 28-53.  On May 12, 2009, a hearing was held before an ALJ. Tr. 15-27.  On July 16, 2009, the ALJ found that Plaintiff was not disabled through the date of the decision. Tr. 6-14.  Plaintiff sought review of the ALJ's decision with the

Appeals Council. Tr. 63. On June 19, 2010, the Appeals Council denied Plaintiff's request for review. Tr. 1-3. As such, the ALJ's decision of July 16, 2009 stands as the final decision of the Commissioner.

## II.
## MEDICAL RECORDS

Plaintiff's medical records reflect that, on July 16, 2007, she presented to Marketa Kasalova, M.D., to establish primary care. Tr. 274-7. Records of this date state that Plaintiff complained of elbow pain[1] caused by a fall the previous month, and that Plaintiff was referred to an orthopedic surgeon. Tr. 275-76.

On July 19, 2007, Plaintiff was seen by David Irvine, M.D., in reference to her elbow injury. Records of this date reflect that Plaintiff reported no pain in the elbow unless it was bumped. Dr. Irvine noted Plaintiff had full range of motion in the right elbow when compared to the left and diagnosed Plaintiff with olecranon bursitis. Tr. 191-92.

On August 9, 2007, Plaintiff had a follow-up appointment with Dr. Irvine. Dr. Irvine reported on this date that Plaintiff stated "the elbow [was] much better" and that "she [was] not really having any pain." Tr. 191. Dr. Irvine further reported that Plaintiff had full range of motion in the right elbow when compared to the left; that the bursitis in the right elbow was resolved; that Plaintiff complained of right knee pain; that Plaintiff reported pain with tenderness where the quadriceps tendon inserts on the patella and that she did not have any problems with movement, stability,

---

[1] There is some discrepancy in the medical records as to which elbow was actually injured. The notes from the initial meeting with Dr. Kasalova refer to "*R* elbow pain" and "*R* elbow cyst." Tr. 274-5. Notes of Plaintiff's first visit with Dr. Irvine refer to Plaintiff's "injured [] *left* elbow" but these notes also reference radiographs the *right* elbow. Tr. 191-92. Notes of Plaintiff's second visit with Dr. Kasalova refer to "follow up of olecranon bursitis to the *right* elbow." Tr. 192. The single reference to the left elbow appears to be a clerical error.

swelling, catching, or locking; that the knee could be "fully extend[ed] and flex[ed] to approximately 130 degrees; that Plaintiff had "5/5 quadriceps strength and hamstring strength"; and that Plaintiff was diagnosed with quadriceps tendinitis in her right knee, placed on a Medrol Dosepak, and sent to physical therapy with ultrasound care. Tr. 190-92.

On September 5, 2007, Plaintiff was admitted to St. John's Mercy Medical Center complaining of chest pain and shortness of breath. Records of this date reflect that Plaintiff's pain was believed to be musculoskeletal or a result of Plaintiff's acid reflux; that nodules were found in Plaintiff's right lung; and that the need for further testing was discussed with Plaintiff. Tr. 195-203.

On September 10, 2007, Plaintiff presented to Dr. Kasalova complaining of trouble breathing. Dr. Kasalova reported that Plaintiff was "agitated, anxious, [and] cried during the exam"; that Plaintiff was prescribed Lorazepam for anxiety; and that a neck CT was ordered. Tr. 278.

A September 12, 2007 PET-CT scan showed that Plaintiff had a possible high-grade lung tumor. Tr. 216. A report from a pulmonary function test performed on this same date showed that "spirometry, lung volumes, and diffusing capacity [were] within normal limits." Tr. 218-9.

Subramanian Paranjothi, M.D., a pulmonologist, reported, on September 14, 2007, that Plaintiff's symptoms included insomnia and anxiety. Tr. 139.

On September 18, 2007, Plaintiff was seen by James Boyd, M.D., who determined that she "should undergo further evaluation of the lung lesion." Dr. Boyd's assessment included hypertension, anxiety/depression, asthma, and tobacco abuse. Tr. 169, 181-82.

From September 28 to October 9, 2007, Plaintiff was hospitalized for removal of her right lung nodule. The surgery was performed by Mark Blucher, M.D. Discharge notes state that Plaintiff

was in stable condition with no complications from the operation. Tr. 228-29.  A surgical pathology report states that the removed tissue indicated tumor carcinoma. Tr. 247-9.

On October 11, 2007, Dr. Kasalova reported that Plaintiff was seen for a follow-up appointment; that Plaintiff complained of nausea, acid reflux, post-op pain, and abdominal tenderness; that Plaintiff was diagnosed with gastroesophageal reflux disease ("GERD"); and Plaintiff's prescription for Protonix was modified and she was prescribed Phenergan for nausea. Tr. 283-4.

On October 25, 2007, Dr. Kasalova reported that Plaintiff complained of sores in her mouth and abdominal tenderness; that she denied chest pain, shortness of breath, and complications from medication; and that an ultrasound of the liver was ordered. Tr. 285-86.

Dr. Blucher reported, on October 30, 2007, that Plaintiff "felt she had turned the corner and [was] now only taking one pain pill in the morning and one at night and [felt] much, much better." Dr. Blucher further reported that Plaintiff had no shortness of breath; that she was making "a very good recovery"; and that he "suspect[ed] with a stage 1A lesion all she [would] need [was] close follow up with CT scans which [could] be done through her oncologist." Tr. 145.  Also, on October 30, Plaintiff underwent a chest x-ray for her lung cancer.  The report of this x-ray states that there was "[i]nternal improvement." Tr. 250.

On October 31, 2007, John Finnie, M.D., reported that Plaintiff did not require adjuvant chemotherapy due to the stage, type, size, and lack of metastatic evidence of her tumor; and that he recommended CT scans every four to six months for the first two years, "and then the interval could be extended." Tr. 157-61.  Also, an October 31, 2007 ultrasound of Plaintiff's abdomen did not reveal any abnormalities in the scanned areas of the gallbladder or biliary tree. Tr. 287.

On November 13, 2007, Dr. Boyd reported that Plaintiff had a possible tongue lesion, septal deviation, right upper lobe lung mass, hypertension, anxiety/depression, asthma, and tobacco abuse." Tr. 171-72.

On November 26, 2007, Dr. Boyd performed a "[m]icrodirect laryngoscopy with biopsy basal tongue and septoplasty." Dr. Boyd, post-operatively, diagnosed Plaintiff with "[r]ight basal tongue lesion and septal deviation." Tr. 183.

On December 6, 2007, Dr. Kasalova noted that Plaintiff's anxiety remained stable . In regard to Plaintiff's hypertension, Dr. Kasalova noted Plaintiff's blood pressure remained satisfactory and that no change in medication was needed. Dr. Kasalova also noted Plaintiff's GERD had worsened; that monitoring for complications was sufficient; and that no change in medication was needed. Tr. 288-89.

On December 11, 2007, Dr. Boyd reported that Plaintiff continued to have oral thrush; that it did not require treatment; that Plaintiff complained of acid reflux and congestion; and that Dr. Boyd reassured Plaintiff her symptoms would continue to improve slowly. Tr. 175-76.

Also, on December 11, 2007, Plaintiff presented to Dr. Irvine concerning her knee and elbow. Dr. Irvine assessment included "olecranon bursitis, right elbow, resolved," "quadriceps tendinitis, right knee, with degenerative joint disease." Dr. Irvine reported that Plaintiff had "full active extension," "full flexion to at least130 degrees," and "5/5 strength to her hamstrings and quadriceps." Dr. Irvine further reported that Plaintiff told him that her "elbow ha[d] been treated and the bursitis ha[d] resolved"; and that she "still occasionally note[d] some soreness but [did] not have any complaints regarding the elbow." Radiographs of Plaintiff's right knee, performed this same date,

5

did not "reveal a lateral tracking patella" and revealed "some osteophyte formation but [Plaintiff's] joint spaces [were] fairly well-maintained, with flattened condyles." Tr. 189-90.

Dr. Irvine reported, on December 18, 2007, that Plaintiff said that her knee continued to "have some mechanical symptoms"; that "the knee [was] not bothering her very badly"; and that "the elbow [was] doing better" and "just occasionally [would] get some pain when she lean[ed] against it." Dr. Irvine further reported that Plaintiff had "full active range of motion of her right arm as compared to the left"; that, in regard to the right knee, "ligamentously [Plaintiff was] stable, although she [did] have some patellofemoral crepitus with motion"; that radiographs of the right knee did "reveal degenerative joint disease, with intact ligaments and menisci"; and that the assessment included *resolved* bursitis of the right elbow and *mild* degenerative joint disease of the right knee. Dr. Irvine also reported that because Plaintiff "state[d] that she [was] not really having much discomfort with her knee, [] she [did] not want to undergo any type of intra-articular injection." Tr. 188.

Dr. Boyd reported, on December 20, 2007, that Plaintiff presented because her dentist discovered lesions on her gums; that Dr. Boyd diagnosed a denture ulcer and instructed Plaintiff to leave her dentures out as much as possible; that Dr. Boyd concluded a biopsy was not warranted; that Plaintiff's appearance was normal "appearing in no distress"; that Plaintiff's septum appeared "well healed and straight"; and that she had normal range of motion in her shoulders. Dr. Boyd's assessment on this date included tongue lesion, septal deviation, resolved, right upper lobe lung mass, hypertension, anxiety/depression, asthma, tobacco abuse, and denture ulcer. Tr. 177-78.

On January 8, 2008, Dr. Kasalova reported that Plaintiff's anxiety was unchanged; that Plaintiff "admitted getting Valium from her OB"; that Plaintiff's GERD symptoms had worsened; that

6

the lesion in Plaintiff's mouth was benign; and that Plaintiff was "healthy appearing" and "in no distress." Tr. 294-95.

Also, on January 8, 2007, Dr. Boyd noted that Plaintiff reported that her nose was "significantly better and she [had] minimal discomfort in her throat"; that Plaintiff complained of acid-reflux; that Plaintiff appeared to be in no distress; and that she had normal range of motion in her shoulders. Tr. 179-80.

On January 24, 2008, Plaintiff presented to Dr. Kasalova complaining of abdominal pain. Upon examination, Dr. Kasalova reported that Plaintiff had decreased breath sounds bilaterally; that, in regard to her cardiovascular system, she had regular rhythm and no murmurs, rubs, or gallops; and that, in regard to her gastrointestinal system, Plaintiff had normal bowel sounds, no "CVA tenderness," and tenderness in the right lower quadrant. Tr. 301-02.  The impression from a CT scan of the pelvis performed on this same date was "[s]evere fatty infiltration of the liver," and " mild right middle lobe infiltrate or atelectasis."   A report from chest x-rays taken on this date states that Plaintiff's left lung was clear, her heart size and mediastinal contours were normal, and that there was no pneumothorax, pleural effusion, pulmonary nodule or bony abnormality "other than thoracic degenerative changes." Tr. 299-302.

On January 29, Loren Marshall, M.D., reported that colonoscopic findings were normal. Tr. 303-307.

On March 4, 2008, Dr. Kasalova reported that Plaintiff complained of back and leg pain, worsening anxiety, periods of shortness of breath, and swelling, stiffness and pain in her joints; that she said there was no change in her reflux symptoms and expressed concern about her possible liver disease; that Dr. Kasalova noted joint tenderness upon physical examination of Plaintiff; that Plaintiff

7

reported she had a period of shortness of breath; that Plaintiff was healthy appearing and in no physical distress; that Plaintiff "request[ed] a wheel chair because she [had] knee arthritis and [was] not able to stand up for very long"; that, in regard to her respiratory system, Plaintiff was clear to auscultation and percussion and had normal respiratory effort; that the risks of smoking were discussed with Plaintiff; that Plaintiff's Lorazepam for her anxiety was discontinued because she was receiving Valium from another doctor, her Buspar prescription was modified, and her Lexapro was continued; that Plaintiff's blood pressure had worsened and was 140/100; that Plaintiff had not taken her blood pressure medication on the day of the examination; that Plaintiff was "instructed that if noncompliance persist[ed] that there was a possibility of being discharged from the practice"; that Plaintiff was "somewhat compliant with diet"; that, in regard to chronic liver disease and cirrhosis, the risks of alcohol consumption and the need to lose weight were emphasized; and that Darvocet was prescribed for Plaintiff's knee pain. Tr. 308-11.

Dr. Irvine reported, on March 14, 2008, that Plaintiff presented for bilateral knee pain; that Plaintiff denied catching, locking, or instability; that she had not noted any swelling; that Plaintiff said, in the past, physical therapy did not help with her right knee; that radiographs demonstrated "some early degenerative changes" and that Plaintiff had "laterally tracking patella bilaterally"; that the diagnosis was "[m]ild degenerative joint disease, bilateral knees, with maltracking patellae"; and that Plaintiff received injections in her right knee and was fitted for a knee brace. Tr. 187.

On April 10, 2008, Plaintiff underwent a PET-CT scan to follow-up on her lung cancer.  The impressions included no findings to suggest a recurrence of lung cancer, "normal findings within the head neck, specifically in the region of the base of the tongue," and "[p]robable atelectasis in the right lower lobe of the lung."  It was noted that "[s]erial imaging [was] still [] recommended to confirm

8

that pattern show[ed] continued improvement." Tr. 266-67.

On April 22, 2008, Plaintiff underwent a CT scan of the chest, abdomen, and pelvis. The results showed "diffuse low attenuation of the liver, consistent with fatty infiltration," no focal hepatic or spenic lesions, unremarkable adrenal glands, pancreas, gallbladder, and kidneys , and no bowel dilation. The impression was no evidence of metastatic disease. Tr. 268-9.

On May 14, 2008, Plaintiff presented to Dr. Kasalova complaining of foot pain, lack of energy, and digestive issues. Dr. Kasalova reported that Plaintiff's blood pressure was 126/84 and had improved; that she was "tolerating" blood pressure medication; that her GERD symptoms had worsened; that she had no complications from medication for GERD; that Plaintiff had bloating; that Plaintiff was healthy appearing and in no distress; that Plaintiff had normal gait; and that she was prescribed Crestor for hyperlipidemia and lab tests were ordered to perform a comprehensive metabolic panel and a lipid panel. Tr. 318-20.

On May 16, 2008, Dr. Irvine reported that Plaintiff presented complaining of foot pain; that Plaintiff was diagnosed with "[b]ilateral hallux valgus deformity"; and that she was prescribed Indocin for possible gout. Tr. 186.

On October 7, 2008, Plaintiff presented to Jennifer Shashek, M.D., for psychiatric evaluation and treatment. Records of this date state that Plaintiff was appropriately dressed and groomed; that her speech was regular, in regard to rate and tone; that Plaintiff said she had good days and bad days; that Plaintiff said that she thought Wellbutrin helped her depression; that Plaintiff denied suicidal or homicidal thoughts; that Dr. Shashek diagnosed Plaintiff as having an adjustment disorder with

depressed and anxious features and a global assessment of functioning ("GAF") of 50[2]; that Wellbutrin and Ativan were continued; and that Plaintiff did not want to begin an SSRI (selective serotonin reuptake inhibitor) for anxiety. Tr. 347-49.

On October 14, 2008, Plaintiff underwent an MRI of her spine to find any potential metastatic deposits. The report from this MRI states that no metastatic deposits were "appreciated; that the examination was limited because there was a poor signal-to-noise ratio; that, at C3-C4, there were degenerative endplate changes and canal stenosis; that there was canal stenosis at C4-C5, C5-C6, and C6-C7; that, at C5-C6, there was severe right side foraminal narrowing and moderate to severe left side foraminal narrowing; that, at C6-C7, there was severe foraminal narrowing; that, at T10-T11, there was "marked disc degeneration and desiccation," an annular tear, central disc protrusion, and moderate canal stenosis; that, at T9-T10, there were degenerative endplate changes; that, at L4-L5, there was "marked narrowing and desiccation," a generalized disc bulge, moderate to severe  right side foraminal narrowing, moderate left side foraminal narrowing, and canal stenosis; that, at L3-L4, there was a generalized disc bulge to the left resulting moderate right side foraminal narrowing and severe left side foraminal narrowing; that, at L3-L2, there was a general disc bulge, mild foraminal narrowing, and mild canal stenosis; and that there was a bony hemangioma at L2. Tr. 340-41.

On November 17, 2008, Dr. Shashek reported that Plaintiff was cooperative and made good

--------

[2]     Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations.  See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994).  Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represent "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild,"  and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32.

eye contact; that Plaintiff said that she had traveled to Nevada and Ohio, was looking for work, and was selling campaign buttons; that Dr. Shashek diagnosed Plaintiff with adjustment disorder with depressed and anxious features; that Plaintiff's mood was "okay"; and that Dr. Shashek continued Plaintiff's Wellbutrin and Ativan. Tr. 350-51.

Dr. Shashek reported, in February 2009,[3] that Plaintiff was anxious about finances; that Plaintiff's mood was "depressed, anxious"; that Plaintiff was diagnosed as having adjustment disorder with depressed and anxious features; that Wellbutrin, Ativan, Budeprion, and Citalopram were prescribed; and that, when offered a return appointment earlier than one month, Plaintiff declined. Tr. 252.

In May 2009,[4] Plaintiff met with Dr. Shashek for five minutes due to Plaintiff's tardiness. Records of this date state that Plaintiff reported that her appetite was down, that she slept a lot during the day, and that she had not been sleeping well at night; that Dr. Shashek diagnosed adjustment disorder with depressed and anxious features; and that Plaintiff's medications were continued. Tr. 354.

## III.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting

---

[3]     The day of this visit is not clear from the record. Tr. 352.

[4]     The day of this visit is not clear from the record. Tr. 354.

11

Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)).  In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment. 20 C.F.R. §§  416.920(c),  404.1520(c).   The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities."  Id.  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996))).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); pt. 404, subpt. P, app. 1.  If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f).  The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity ("RFC"). Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000).  The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Steed, 524 F.3d at 874 n.3; Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC.").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617; Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022.  See also Eichelberger,  390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

14

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

Additionally, an ALJ's decision must comply "with the relevant legal requirements." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

15

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322.  The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id.  The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Polaski, 739 F.2d at 1322; Cruse, 867 F.2d at 1186.

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy.  Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)).  The Commissioner must first prove that the claimant retains the RFC to perform other kinds of work. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.  The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983).  Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

**IV.**

16

**DISCUSSION**

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804.  Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

At the hearing, Plaintiff testified that she completed three years of college; that she had training as a keypunch data entry person; that she was self-employed from 1995 until 2007 as a political consultant; that she had also worked for the census; that, as a self employed person, she had delivered newspapers from 1995 "to present"; that she had been in jail ten to fifteen times "with [her] job"; that she had back pain, a lack of feeling in her left arm, diabetes, gout, knee pain, bursitis, and throat ailments; that her diabetes was controlled; that she received treatment for gout when it flared up; that she had cancer in 2007; that she had depression, for which she began seeing a doctor four to six months prior to the hearing; that she could stand for a half hour, sit for twenty minutes to a half hour, and lift "five pounds, ten pounds"; and that she could not lift a bag of groceries. Tr. 17-26.

The ALJ found Plaintiff had not engaged in substantial gainful activity ("SGA") since her alleged onset date; that Plaintiff's degenerative disc disease was a severe impairment; that Plaintiff's gout, emphysema, arm numbness, and heart problems lacked medical evidence supporting their existence in the record; that Plaintiff's lung cancer did not meet the twelve month durational requirement; that Plaintiff's diabetes, asthma, right knee condition, and depression were not severe; that Plaintiff's conditions did not meet or equal a listing; that Plaintiff had normal spinal range of motion and neurological results; that Plaintiff was capable of performing the full range of medium

17

work; that Plaintiff's claims of disability were not credible in light of Plaintiff's claimed activities; that Plaintiff's RFC permitted her to perform her past relevant work as a vendor and political consultant; and that, therefore, Plaintiff was not disabled. Tr. 9-14.

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ did not consider the medical evidence when determining her RFC; because the ALJ's RFC determination is not supported by the medical evidence; because the ALJ failed to provide sufficient explanation for his RFC finding; because the ALJ failed to include, in his RFC finding, Plaintiff's nonexertional limitations which result from her mental impairments; because the ALJ erred in finding she had no restrictions of activities of daily living, no difficulties with concentration, persistence and pace, and only mild limitations with social functioning;  because the ALJ failed to explain, in regard to her mental condition, that test results were unremarkable; because the ALJ failed to address a positive mental status examination; because the ALJ failed to consider all the medical evidence relevant to her mental impairment; and because the ALJ failed to find severe impairments in regard to Plaintiff's knee condition.

A.      **Plaintiff's Mental Impairment**:

Plaintiff alleges that the ALJ erred in finding that her depression was not severe.  20 C.F.R. ch. lll, pt. 404, supt. P, app.1 § 12.00(a) states, in relevant part, that:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

The Commissioner has supplemented the familiar five-step sequential process for generally

evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments. 20 C.F.R. § 404.1520a. A special procedure must be followed at each level of administrative review. See Pratt v. Sullivan, 956 F.2d 830, 834 n.8 (8th Cir. 1992) (per curiam). This Regulation states that the steps set forth in § 404.1520 also apply to the evaluation of a mental impairment. § 404.1520a(a). However, other considerations are included. The first step is to record pertinent signs, symptoms, and findings to determine if a mental impairment exists. 20 C.F.R. § 404.1520a(b)(1). These are gleaned from a mental status exam or psychiatric history and must be established by medical evidence consisting of signs, symptoms, and laboratory findings. 20 C.F.R. § § 404.1520a(b)(1).

If a mental impairment is found, the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent. 20 C.F.R.§ 404.1520a(b)(1). The procedure then requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work. 20 C.F.R. § 404.1520a(c)(2). Those areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 404.1520a(c)(3).

The limitation in the first three functional areas of activities of daily living (social functioning and concentration, persistence, or pace) is assigned a designation of either "none, mild, moderate, marked, [or] extreme." 20 C.F.R. § 404.1520a(c)(4). The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: "[n]one, one or two, three, four or more." Id. When "the degree of []limitation in the first three functional areas" is "none" or "mild" and "none" in the area of decompensation, impairments are not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic

work activities." 20 C.F.R. § 404.1520a(d)(1).  When it is determined that a claimant's mental impairment(s) are severe, the ALJ must next determine whether the impairment(s) meet or are equivalent in severity to a listed mental disorder. This is done by comparing the medical findings about a claimant's  impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. See 20 C.F.R. § 404.1520a(d)(2).  If it is determined that a claimant has "a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing," the ALJ must then assess the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3).

Upon finding that Plaintiff did not suffer from a mental disability as a result of alleged depression, the ALJ considered the medical evidence, as required by the first step of a mental impairment analysis, as well as Plaintiff's functional limitations. See Pratt, 956 F.2d at 835; 20 C.F.R. §§ 404.1520a(b)(1), 404.1508.  In particular, the ALJ considered that Plaintiff was diagnosed with adjustment disorder in late 2008 and that mental status evaluations performed by her treating psychiatrist had unremarkable results, "save for an abnormal mood and/or affect." Tr. 12.

The ALJ also considered that the GAF which Dr. Shashek assigned to Plaintiff, upon first seeing her, is not supported by evaluation results.  Indeed, the Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 32, 34 (4th ed. 2000), states that a GAF score of 50 indicates "serious symptoms or serious impairment in social, occupational, or school functioning." Halverson v. Astrue, 600 F.3d 922, 930-31 (8th Cir. 2010) (citing Pate-Fires v. Astrue, 564 F.3d 935, 944 (8th Cir. 2009)).[5]  As set forth above, Dr. Shashek's notes do not indicate such symptoms.  For example, in

---

[5]      In Pate-Fires, 564 F.3d at 944, the Eighth Circuit held that because the claimant had only four out of twenty-four GAF scores above 50, the record supported the treating doctor's assessment that the claimant was not capable of gainful employment.  On the other hand, in Halverson, 600 F.3d at 930-31, the claimant had only one score of 40, while she had "dozens of earlier examinations" which "indicated GAF scores between 52 and 60."  Under such

October 2008, Dr. Shashek reported that Plaintiff had good and bad days and that she did not have suicidal ideations.  Moreover, the "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' although an ALJ may use GAF scores to assess the level of a claimant's functioning.  Halverson, 600 F.3d at 930-31 (quoting 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (Aug. 21, 2000), and citing Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the [residual functional capacity], it is not essential to the RFC's accuracy.")).

Further, in October 2008, Dr. Shashek reported that Plaintiff said that medication helped her depression.  See Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009) (holding that conditions which can be controlled by treatment are not disabling); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling); Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989).

Additionally, Dr. Shashek's November 2008 notes reflect that Plaintiff had traveled out of state and was looking for work.  These activities suggest that Plaintiff's mental condition was not as severe as she alleges.  See House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (holding that the claimant's looking for work was inconsistent with a claim of disability); Goff, 421 F.3d at 792 ("Inconsistencies between [a claimant's] subjective complaints and [his] activities diminish [his]

---

circumstances, the assessment of 40 made by a treating psychiatrist was not given controlling weight.

credibility."); Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Nguyen v. Chater, 75 F.3d 429, 439-31 (8th Cir. 1996) (holding that a claimant's daily activities, including visiting neighbors, cooking, doing laundry, and attending church, were incompatible with disabling pain and affirming denial of benefits at the second step of analysis); Benskin, 830 F.2d at 88.

The court also notes that Plaintiff did not seek treatment from a psychologist or psychiatrist until approximately four months after she filed her application for benefits, although she had previously obtained Valium from her gynecologist. Seeking limited medical treatment is inconsistent with a claim that an impairment is severe. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003) ("[T]he ALJ concluded, and we agree, that if her pain was as severe as she alleges, [Plaintiff] would have sought regular medical treatment."); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("[Claimant's] failure to seek medical assistance for her alleged physical and mental impairments contradicts her subjective complaints of disabling conditions and supports the ALJ's decision to deny benefits.").

Consistent with the requirement of § 404.1520(a) and 20 C.F.R. § 404.1520a(b)-(c), after considering the medical evidence, the ALJ considered that Plaintiff had not had episodes of decompensation and had no restrictions of activities of daily living, difficulties maintaining concentration, persistence or pace, and no more than mild difficulties maintaining social functioning. Tr. 12. Significantly, Plaintiff stated, in a Function Report, dated July 7, 2008, that she did errands, went food shopping; that sometimes she went to the store for her mother; that she shopped "every few days"; that she prepared food "daily or every 2 days"; that she could do laundry and "clean house a bit"; that she drove a car; that when going out, she did so alone; that she followed spoken instructions "pretty good - unless [her] mind [was] preoccupied"; and that she did not have any

22

problems getting along with family, friends, neighbors, or others.[6] Tr. 104-106.

To the extent Dr. Shashek diagnosed Plaintiff with a GAF of 50, she did so at Plaintiff's first session. "Generally, the longer a treating source has treated [a claimant] and the more times [the claimant has] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion." 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i). Further, the record does not reflect that Dr. Shashek conducted any testing to reach the conclusion that Plaintiff's GAF was 50. While the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989). Moreover, the record suggests that Dr. Shashek relied on Plaintiff's self reporting of her symptoms. See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007)

---

[6]     A claimant's daily activities can be seen as inconsistent with her subjective complaints and may be considered in judging the credibility of her complaints. Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992); Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987); Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) (citing Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987)). "Inconsistencies between [a claimant's] subjective complaints and [his] activities diminish [his] credibility." Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (citing Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). See also Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Nguyen v. Chater, 75 F.3d 429, 439-31 (8th Cir. 1996) (holding that a claimant's daily activities, including visiting neighbors, cooking, doing laundry, and attending church, were incompatible with disabling pain and affirming denial of benefits at the second step of analysis). In this regard, the ALJ noted that Plaintiff's daily activities were inconsistent with her subjective complaints. Tr. 13. The court notes that the ALJ's decision, in this regard, is supported by substantial evidence and that it is consistent with the case law and Regulations.

(holding that the ALJ was entitled to give less weight to the opinion of a treating doctor where the doctor's opinion was based largely on the plaintiff's subjective complaints rather than on objective medical evidence) (citing  Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005)); Woolf v. Shalala, 3 F.3d 1210 (8th Cir. 1993); Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data).

The court notes that, in February 2009, Dr. Shashek reported that Plaintiff was anxious about finances as she was late on her house payment. See Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (holding that depression was situational and not disabling because it was due to denial of food stamps and workers compensation and because there was no evidence that it resulted in significant functional limitations).

In support of her position that the ALJ's decision is not supported by substantial evidence, Plaintiff directs the court's attention to Dr. Shashek's reporting that Plaintiff had "an abnormal mood and/or affect." Tr. 12.  However, such an observation alone does not therefore meet the Plaintiff's burden of demonstrating "a severe impairment." 20 C.F.R. § 404.1520(c).  "The severity Regulation adopts a standard for determining the threshold level of severity: the impairment must be one that 'significantly limits [a claimant's] physical or mental ability to do basic work activities.'" Bowen v. Yuckert, 482 U.S. 137, 153 n.11 (1987) (quoting 20 CFR § 404.1520(c) (1986)).  The ALJ properly found Plaintiff failed to meet this burden.  In any case, the ALJ was required to, and did, evaluate the record as a whole in regard to Plaintiff's mental impairment. See Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) ("Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole.").

24

To the extent Plaintiff suggests that the ALJ should have further developed the record in regard to her mental impairment, "[a]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Haley v. Massanari, 258 F.3d 742, 749-50 (8th Cir. 2001) (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994). The court finds that the record in the matter under consideration was sufficiently developed for the ALJ to render an opinion and that he was not required to further develop the record.

To the extent Plaintiff contends that the ALJ did not address specific aspects of Dr. Shashek's opinion or that the ALJ did not explain what he meant in regard to his conclusions, the court finds that the ALJ's failure to mention every detail of Dr. Shashek's records does not suggest that the ALJ failed to consider such details. See Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 n.3 (8th Cir. 2005) ("The fact that the ALJ's decision does not specifically mention the [particular listing] does not affect our review."); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995).

In conclusion, the court finds that substantial evidence in the record supports the ALJ's conclusion Plaintiff's depression was not severe. Goff, 421 F.3d at 789 ("The court will affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole.") (internal citation omitted). Further, the ALJ's decision, in this regard, is consistent with the Regulations and case law.

**B.    Severity of Plaintiff's Knee Condition:**[7]

---

[7]    Although the heading of Section C of Plaintiff's Brief in Support of Complaint suggests that Plaintiff challenges the ALJ's findings regarding the severity of alleged conditions other than her knee impairment, Plaintiff does not address physical conditions other than her knee in the substance of her discussion in Section C. Doc. 16 at 19-20. As such, the court need not consider the ALJ's findings regarding the severity of Plaintiff's other alleged disabling conditions. Nonetheless, the court will address, below in the regard to Plaintiff's RFC, the ALJ's consideration of the severity of Plaintiff's alleged impairments other than her knee.

Plaintiff asserts the ALJ failed to properly consider the severity of Plaintiff's knee impairment and should have found that this condition was severe.

In the matter under consideration, the ALJ considered each one of Plaintiff's alleged physical impairments and the medical records relevant to those conditions. In regard to Plaintiff's right knee condition, the ALJ considered that x-rays of Plaintiff's right knee, taken in March 2008, showed early degeneration and that exams did not demonstrate knee deficits or abnormalities other than some crepitus with motion and, on occasion, tenderness about the quadriceps tendon. Tr. 12. The ALJ also noted that, for Plaintiff's knee condition to be disabling, it must have significantly impaired her abilities to perform basic work activities, which include sitting, standing, walking, lifting, carrying, pushing, or pulling. Tr. 12. See 20 C.F.R. § 404.1521 (providing that in order to establish a severe physical impairment, a claimant must show the impairment significantly limited her physical ability to do basic work activities such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling). Indeed, Dr. Irvine reported, on July 17, 2007, that Plaintiff had "[n]o gross deformities" of her lower extremities and had "a normal heel-to-toe gait." Tr. 191. When Plaintiff first complained of knee pain to Dr. Irvine, at her August 9, 2007 appointment, Dr. Irvine observed "[s]he ha[d] not had any problem with moving the leg or having the knee feel unstable. She ha[d] not noted any swelling, catching or locking." Dr. Irvine's physical exam revealed:

> [Plaintiff] is able to fully extend the knee and flex to approximately 130 degrees. She has 5/5 quadriceps strength and hamstring strength as compared to the contralateral limb. She is point tender over the quadricep tendon near its insertion on the patella. I do not note a defect in this region. She is stable to varus and valgus stressing at both zero and 30 degrees. She has a negative Lachman and negative posterior drawer. She has no pain within the medial or lateral joint line. She has no effusion.

Tr. 190-1.

Radiography performed on August 9, 2007, revealed a "lateral tracking patella," and "some osteophyte formation but her joint spaces are fairly well-maintained." Tr. 190.  Plaintiff was diagnosed with quadriceps tendinitis with degenerative joint disease on this date.  Although Plaintiff reported at her next appointment, on December 11, 2007, that "[s]he continue[d] to be bothered somewhat by the knee," she denied "any problems with swelling, catching, locking, instability, or other concerning issues." Tr. 189.   Examination of the knee revealed "no effusion, erythema, ecchymosis, or warmth... full active extension... full flexion, to at least 130 degrees... 5/5 strength to her hamstrings and quadriceps... stab[ility] to varus and valgus stress at both zero and 30 degrees... negative Lachman... tender[ness] over the quadriceps tendon... [but] [no] tender[ness] over the patellar tendon[,] [] medial and lateral joint lines." Tr. 189.   On December 18, 2007, Plaintiff reported that she was not really having much discomfort with her knee and did not want an injection. Tr. 188.  Physical examination on this date revealed "[no] effusions, erythema, or ecchymosis," and Dr. Irvine reported that "[l]igamentously" Plaintiff was stable, "although she [did] have some patellofemoral crepitus with motion." Tr.188.  Dr. Irvine reviewed the MRI of Plaintiff's knee and diagnosed her with "*mild* degenerative joint disease." Tr. 188.  On March 14, 2008 Plaintiff returned to Dr. Irvine complaining of knee pain, but denied any catching, locking, instability, or noticeable swelling. Tr. 187.  In addition to mild degenerative joint disease, Dr. Irvine diagnosed Plaintiff with "bilateral knees, with maltracking patellae." Tr. 188.   At this appointment Plaintiff requested and received a cortisone injection in her right knee as well as a knee brace.  At Plaintiff's last reported visit with Dr. Irvine on May 16, 2008, her knees were not the reason for the visit, or even mentioned. Tr. 186.

Additionally, Dr. Finnie reported, on October 31, 2007, that Plaintiff had "[n]o joint pain,

stiffness, muscular weakness, back pain or leg cramps." Tr. 159. After Plaintiff's last recorded visit

with Dr. Irvine, Dr. Kasalova observed, on May 14, 2008, that Plaintiff had a "[n]ormal gait." Tr.

319. Significantly, when Plaintiff stated that her ability to lift, squat, bend, stand, sit, kneel, and climb

stairs was limited, she said these limitations were caused by having part of her lung removed and

because she has back pain; she did not mention knee pain. Tr. 105. In conclusion, the court finds that

the ALJ properly determined that the medical records did not support a finding that Plaintiff had a

severe impairment of the knee. Tr. 12. See Sours v. Astrue, 374 Fed. Appx. 678, 679 (8th Cir. 2010)

(holding that mere acknowledgment of some physical impairment does not automatically entitle a

claimant to disability benefits because an "impairment is not severe if it amounts only to slight

abnormality that would not significantly limit claimant's physical or mental ability to do basic work

activities; it is claimant's burden to establish his impairment is severe").

    To the extent Plaintiff suggests that the ALJ should have further developed the record in

regard to her knee impairment, the court finds that the record was sufficiently developed for the ALJ

to render an opinion regarding the severity of Plaintiff's knee condition, as well as her other alleged

physical impairments. As such, the ALJ was not required to further develop the record. See Haley,

258 F.3d at 749-50.

    To the extent Plaintiff contends that the ALJ did not address a specific aspect of any of

Plaintiff's medical records relevant to her physical impairments, including her knee impairment, or

that the ALJ did not explain what he meant in regard to his conclusions, the ALJ's failure in this

regard does not suggest that the ALJ failed to consider such details. See Moore ex rel. Moore v.

Barnhart, 413 F.3d 718, 721 n.3 (8th Cir. 2005) ("The fact that the ALJ's decision does not

specifically mention the [particular listing] does not affect our review."); Montgomery v. Chater, 69

28

F.3d 273, 275 (8th Cir. 1995). Although Plaintiff suggests that the ALJ did not consider that she was in a wheelchair in March 2008, when she presented to Dr. Kasalova, Dr. Kasalova's records reflect that it was Plaintiff who requested a wheelchair. Tr. 308-11.

In conclusion, the court finds that substantial evidence in the record supports the ALJ's conclusion Plaintiff's knee condition was not severe. Goff, 421 F.3d at 789. Further, the ALJ's decision, in this regard, is consistent with the Regulations and case law.

**C.      Plaintiff's RFC:**

Plaintiff asserts the ALJ improperly determined Plaintiff's RFC and that the ALJ's decision, in this regard, is not supported by the medical evidence and is based primarily on credibility findings. Doc. 16 at 21-4, Doc. 22 at 3-4.

The ALJ found that:

> Since August 1, 2007, [Plaintiff] [] had the [RFC] to lift or carry fifty pounds occasionally and twenty-five pounds frequently, sit six hours in an eight-hour day and stand and/or walk a total of six hours in an eight-hour day. This constitutes a full range of medium work.

Tr. 12.

"The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney, 228 F.3d at 863). See also Anderson v. Shalala, 51 F.3d. 777, 779 (8th Cir. 1995). RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."

29

SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).  Additionally, "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id.  Moreover, "[i]t is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain." Id.

The ALJ in the matter under consideration found that Plaintiff's claims regarding the severity of her alleged impairments were not credible. Tr. 12-4.  As discussed above, the ALJ found Plaintiff's claimed limitations were not consistent with Plaintiff's daily activities.  See n.6.  An ALJ is not required to believe all of a claimant's assertions concerning her daily activities. Johnson, 87 F.3d at 1018.  As discussed above, a claimant's daily activities can be seen as inconsistent with her subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. Eichelberger, 390 F.3d at 590.   Further, in regard to Plaintiff's alleged physical impairments, the ALJ considered that, at the hearing, Plaintiff was observed "lifting her purse and flinging it over her shoulder."  While an ALJ cannot accept or reject subjective complaints *solely* on the basis of personal observations, Ward v. Heckler, 786 F.2d 844, 847-48 (8th Cir. 1986), an ALJ's observations of a claimant's appearance and demeanor during the hearing is a consideration. Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (holding that an ALJ "is in the best position" to assess credibility because he is able to observe a claimant during his testimony); Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations"); Jones v. Callahan, 122 F.3d 1148, 1151 (8th Cir. 1997) ("When an individual's subjective complaints of pain are not fully supported by the medical evidence in the record, the ALJ may not, based solely on his personal observations, reject the

complaints as incredible."). Here, to reach his conclusion, the ALJ combined his review of the record as a whole with his personal observations.

Additionally, when considering Plaintiff's credibility, the ALJ considered that Plaintiff worked after her alleged onset date. Tr. 13. "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Johnson v. Apfel, 240 F.3d 1145, 1148049 (8th Cir. 2001). "Working generally demonstrates an ability to perform a substantial gainful activity." Goff, 421 F.3d at 792 (citing Nabor v. Shalala, 22 F.3d 186, 188-89 (8th Cir. 1994)). 20 C.F.R. § 404.1574(a) provides that if a claimant has worked, the Commissioner should take this into consideration when determining if the claimant is able to engage in substantial gainful activity. Moreover, when a claimant has worked with an impairment, the impairment cannot be considered disabling without a showing that there has been a significant deterioration in that impairment during the relevant period. See Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990). See also Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) ("[D]espite suffering from what she calls "extreme fatigue," Van Vickle continued working for over four years."). Further, working after the onset of an impairment is evidence of an ability to work. Goff, 421 F.3d. at 793; Goswell v. Apfel, 242 F.3d 793, 798 (8th Cir. 2001). The ALJ additionally considered that no physician had imposed restrictions on Plaintiff, let alone that she was disabled. Tr. 13. A record, such as that in the matter under consideration, which does not reflect physician imposed restrictions, suggests that a claimant's restrictions in daily activities are self-imposed rather than by medical necessity. See Zeiler, 384 F.3d at 936 ("[T]here is no medical evidence supporting [the claimant's] claim that she needs to lie down during the day."); Fredrickson v. Barnhart, 359 F.3d 972, 977 n.2 (8th Cir. 2004) ("There is no

evidence in the record that [the claimant] complained of severe pain to his physicians or that they prescribed that he elevate his foot or lie down daily.").

Further, the ALJ considered that, in the ten-year period of 1997 to 2006, Plaintiff had no earnings in two years and less than $8,400 in earnings in five years.  A long and continuous past work record with no evidence of malingering is a factor supporting credibility of assertions of disabling impairments. Allen v. Califano, 613 F.2d 139, 147 (6th Cir. 1980).  For the same reason, an ALJ may discount a claimant's credibility based upon her poor work record.  Ownbey v. Sullivan, 5 F.3d 342, 345 (8th Cir. 1993).  See also Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).

As such, the court finds that the ALJ properly considered Plaintiff's credibility when determining her RFC and that the ALJ's decision, in this regard, is supported by substantial evidence. See Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010).

Despite Plaintiff's assertion to the contrary, the ALJ did consider the medical evidence relevant to Plaintiff's alleged disabling physical conditions. Only after doing so did the ALJ find that the medical evidence did not support Plaintiff's claim that she was disabled.  The  absence of an objective medical basis to support the degree of a claimant's subjective complaints is an important factor in evaluating the credibility of the testimony and the complaints. See Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991); Edwards v. Sec'y of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987).  In regard to Plaintiff's back pain, the ALJ addressed findings from her October 2008

MRI, as set forth above, and concluded that "[Plaintiff] had normal neurological results and normal spinal range of motion." Tr. 13.  In regard to Plaintiff's lung cancer, the ALJ considered that Plaintiff was diagnosed in September 2007; that she had surgery for this condition that same month; and that records for the post-September 2007 period show that the cancer had remained in remission. 20 C.F.R. § 414.909 states that "[u]nless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement."

The ALJ dismissed Plaintiff's allegations "as to gout, emphysema, arm numbness and heart problems for want of a medically determinable impairment." Tr. 11.  Plaintiff does not suggest that the ALJ erred in reaching this conclusion other than to suggest that the ALJ did not consider the medical evidence.  To the extent that the ALJ did not specifically address the medical records upon which he relied to reach this conclusion, as stated above, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. See Moore, 413 F.3d at 721 n.3.  Moreover, the court notes that on August 9, 2007, Dr. Irvine reported that Plaintiff's injured elbow was much better; that she was not "really having any pain"; that her left elbow bursitis was resolved; and that she had full range of motion. Tr. 191.  In regard to Plaintiff's alleged emphysema, September 12, 2007, spirometry results were within normal limits.  On October 25, 2007, Dr. Kasalova reported that Plaintiff denied chest pain and shortness of breath.  Also, Dr. Kasalova reported, on March 4, 2008, in regard to Plaintiff's respiratory system, that she was clear to auscultation and percussion and had a normal respiratory effort.

In regard to Plaintiff's cardiovascular system, Dr. Kasalova reported, in January 2008, that Plaintiff  had regular rhythm and no murmurs.  Although Plaintiff's blood pressure was elevated on

March 4, 2008, she had not taken her medication that day. See Eichelberger, 390 F.3d at 589 (holding that the ALJ properly considered that the plaintiff cancelled several physical therapy appointments) (citing Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (holding that a claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain). When Plaintiff was compliant, her blood pressure was 126/84.Tr. 318. See Brown v. Heckler, 767 F.2d 451, 453 (8th Cir. 1985) (holding that blood pressure which measures within the range of 140-180/90-115 is considered mild or moderate, and that hypertension does not qualify as severe where it does not result in damage to the heart, eye, brain or kidney) (citing 20 C.F.R. Part 404, Subpart P, Appendix 1, 4.00 C).   In regard to Plaintiff's GERD, Dr. Kasalova reported, on December 6, 2007, that monitoring for complications was sufficient and that no change in Plaintiff's medication was needed.  Dr. Kasalova reported on May 14, 2008, that Plaintiff had no complications from her medication for GERD, although she said her symptoms had worsened. See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) ("We [] think that it was reasonable for the ALJ to consider the fact that no medical records during this time period mention [the claimant's] having side effects from any medication.").  Plaintiff was not diagnosed with "possible gout" until May 16, 2008, at which time she was prescribed medication for this condition. Tr. 186.

        In conclusion, the court finds that the ALJ's determination that Plaintiff did not have medically determinable conditions of gout, emphysema, arm numbness, and heart problems is supported by substantial evidence.  Further, the court finds that the ALJ properly considered the medical evidence, including evidence relevant to all of Plaintiff's alleged physical impairments and her alleged mental impairment, when determining Plaintiff's RFC and that the ALJ's decision, in this regard, is supported by substantial evidence.  Additionally, the court finds that the ALJ's RFC

34

determination is consistent with the medical evidence and the record as a whole and that it is supported by substantial evidence. See Tucker, 363 F.3d at 783; Anderson, 51 F.3d.at 779; Russell, 950 F.2d at 545; Edwards, 809 F.2d at 508.

Only after determining Plaintiff's RFC and the requirements of her past relevant work did the ALJ find that Plaintiff could perform her past relevant work as a vendor and political consultant. See Bowen v. City of New York, 476 U.S. 467, 471 (1986) (holding that if a claimant is found to be able to perform the duties of her past relevant work, then she is considered not disabled and therefore ineligible for benefits); Martin v. Sullivan, 901 F.2d 650, 652 (8th Cir. 1990).  As such, the court finds that the ALJ's decision that Plaintiff was not disabled is supported by substantial evidence and that it is consistent with the Regulations and case law.

## V.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in the Compliant and Brief in Support of Complaint is **DENIED;** Docs. 1, 16.

**IT IS FURTHER ORDERED** that a separate Judgment shall be entered in favor of Defendant and against Plaintiff in the instant cause of action and incorporating this Memorandum Opinion.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER

35

UNITED STATES MAGISTRATE JUDGE


Dated this 7th day of September, 2011.